914 So.2d 1048 (2005)
BLUE PAPER, INC., a Florida corporation, Appellant,
v.
William J. PROVOST, Appellee.
No. 4D04-4176.
District Court of Appeal of Florida, Fourth District.
November 23, 2005.
*1049 David J. Valdini and Sharon Kung of Valdini & Palmer, P.A., Fort Lauderdale, for appellant.
John J. Shahady of Adorno & Yoss, LLP, Fort Lauderdale, for appellee.
GROSS, J.
Blue Paper, Inc., appeals a final judgment and decree for specific performance in favor of William Provost entered after a non-jury trial. Blue Paper contends that legal deficiencies in the parties' contract preclude specific performance. We affirm the judgment of the trial court.
We state the facts in the light most favorable to Provost, the prevailing party below. E.g., Darrow v. Moschella, 805 So.2d 1068, 1069 (Fla. 4th DCA 2002).
This case arose out of a contract for the purchase and sale of a townhouse located in Hillsboro Beach, Florida. Provost was the purchaser, and Blue Paper was the seller and developer of the townhouse project. Provost became aware of the property through his friend, Joseph Ieracitano, the owner of Blue Paper. After Provost expressed interest in another of Ieracitano's developments, Ieracitano told him about the Aqualina project, which consisted of four units. Provost focused on unit 1, because it was the closest to a bridge, had a view of the ocean and inlet, and was the only unit with a private pool.
Provost intended to purchase the townhouse as an investment. He anticipated that another individual, Stephen Lustig, would invest with him. By the time of closing, Provost intended to form a limited liability company to take title to the property.
Blue Paper and Provost executed a sales contract on November 21, 2002. The contract identified the buyer as "William Provost, on behalf of a Limited Liability Company to be formed under the laws of the State of Florida, and/or assigns." Provost signed the contract in his individual capacity. The total purchase price was $2,100,000. The contract called for Provost to make a deposit of $100,000 upon execution of the contract, and another $100,000 when a pre-cast roof was put in place. The remainder of the purchase price was to be paid at closing.
Even though the contract called for Provost to make a $100,000 initial deposit, Provost paid Blue Paper only $75,000, which Blue Paper accepted without complaint. To complete the project, Blue Paper intended to obtain a construction loan. In order to make the loan, the lender required Blue Paper to have in hand three bona fide sales contracts with $100,000 deposits.
*1050 Ieracitano agreed that Provost could pay the remaining $25,000 called for by the contract prior to the closing of the construction loan.
The contract contained other provisions pertinent to this appeal. It stated that "the contract may not be changed or terminated orally and may be amended and modified only by an instrument in writing executed by both parties." The contract also provided that "[i]f any portion of this agreement is found to be void for any reason whatsoever, the remainder of the agreement shall remain in full force and effect, as if the void portion had never been included herein."
The agreement's default provisions entitled the seller to keep the buyer's deposit if the buyer defaulted. In the event of the seller's default, the buyer's remedy was to receive a refund of his deposit or obtain specific performance.
On January 13, 2003, the parties executed a written amendment to the contract. Even though Provost had paid Blue Paper only $75,000, the amendment indicated that $100,000 was being held in escrow. The amendment described the original contract as being "in good standing and enforceable in accordance with its terms." The amendment extended the time for completion of the townhouse from one year to fifteen months; the document made provisions for closing even if the seller was unable to build or complete the construction of a boat dock. The amendment reaffirmed the original contract, except as modified by the amendment.
On January 14, the parties executed another document entitled "addendum." As an expansion of the contract amendment, the addendum attempted to delineate the parties' agreement in the event Blue Paper was unable to deliver a boat dock with the townhouse. Recognizing that the property was "very desirable and saleable," the addendum allowed the buyer the option to terminate the contract "at any time prior to closing" and receive back his deposit plus interest. The addendum gave the buyer two options if, for any reason, a dock was "not allocated for unit # 1." First, the buyer could proceed to closing and receive a $200,000 credit against the purchase price; alternatively, the buyer could cancel the contract and receive damages of $200,000 plus his "earnest money deposits."
Ieracitano told Provost that he would let him know when the remaining $25,000 deposit was due and Provost obtained information about the mechanics of sending a wire transfer to the escrow agent.
On January 27, 2003, Blue Paper entered into another contract to sell unit # 1 to a third party for $2,100,000, but upon more favorable terms than the contract with Provost. Blue Paper's construction loan closed two days later.
On February 6, 2003, Blue Paper's attorney wrote Provost declaring him in default for failure to post the additional $25,000 deposit. Blue Paper had not previously requested that Provost pay the rest of the deposit. Taken by surprise, Provost turned the letter over to his attorney, who responded that the February 6 letter was an "initial demand" for the $25,000, which he immediately tendered.[1]
Blue Paper persisted in treating the contract as terminated, declared the $75,000 deposit to be forfeited, and demanded that *1051 the escrow agent disburse it to Blue Paper.
In ordering specific performance for Provost, the trial judge expressly found that the contract was enforceable, but that the "addendum" was not. Provost has not cross-appealed this finding of the trial court. We proceed on the assumption that the trial court ordered specific performance of the original contract as modified by the January 13 amendment, but not the January 14 "addendum."
Blue Paper first argues that there was no mutuality of obligation in the "addendum" which gave Provost the right to unilaterally terminate the contract and "have his deposit returned." We do not address this issue because the trial court did not base specific performance on the addendum. The contract provided that the remainder of the agreement could be enforced even if a portion of it were found to be void for any reason.
Blue Paper next contends that specific performance is improper because there was no mutuality of remedy. See Con-Dev of Vero Beach, Inc. v. Casano, 272 So.2d 203, 206 (Fla. 4th DCA 1973) (stating that "[i]n suits for specific performance of a contract there must be mutuality of obligation and remedy."). This argument is based on the following language in Bryce v. Bull, 106 Fla. 336, 143 So. 409, 410 (1932):
The rule that one who assumes to act as an agent for a principal who has no legal status or existence renders himself individually liable on contracts so made does not apply where the third person has knowledge of the nonexistence or incompetency of the principal[.]
Blue Paper asserts that applying the rule in Bryce would have precluded it from enforcing the agreement against Provost, because Blue Paper knew that Provost signed the contract on behalf of an entity that did not exista limited liability company that he expected to form prior to closing. Blue Paper argues that if the contract was not enforceable against Provost there was no mutuality of remedy.
We agree with the second district's characterization of the above-quoted language as dictum. See Vodopich v. Collier County Developers, Inc., 319 So.2d 43, 44 (Fla. 2d DCA 1975). In Bryce, the supreme court found that the promoter of a nonexistent corporation was personally liable on a contract, where nothing in the contract indicated that the seller had knowledge that the promoter was "buying the property for a corporation to be created" and the contract did not "contain words that show[ed] an intention to exempt [the promoter] from liability." Bryce, 143 So. at 410-11. The holding of Bryce is thus more narrow than the "rule" upon which Blue Paper relies.
As the second district observed in Vodopich, when a corporate promoter enters into a contract on behalf of a nonexistent corporation, a corporate promoter may escape personal liability when the other party knows of the nonexistence of the contemplated corporation and "the parties agreed to bind the corporation alone." 319 So.2d at 44. The general rule is that "the promoter of a corporation is personally liable on the contracts entered into on behalf of the corporation he is organizing." Id. The exception to the general rule applies "`where a promoter contracts in the name of a corporation which is to be formed later and does not intend to be liable on it, and the other party knows that the corporation has not been formed and that the promoter does not intend to be liable.'" Id. (quoting Frazier v. Ash, 234 F.2d 320, 326-27 (5th Cir.1956) (quoting 2 WILLISTON § 306, at 426 (1959))). If a corporate promoter is relieved of personal *1052 liability when the person with whom he contracts "merely has knowledge of the nonexistence of the corporate entity for whom the promoter purports to act," then a corporation "would have an ingenious method of speculation sanctioned by law, whereby it could reap all the speculative advantages of a timely adoption without any of the attendant disadvantages." Vodopich, 319 So.2d at 45.
The contract in this case demonstrates that Provost was bound by it. He signed the contract in his personal capacity. Nothing in the contract exempts Provost from personal liability. Nothing in the contract obligates Blue Paper to look only to the projected limited liability company for responsibility. The contract entitled Blue Paper to keep Provost's deposit if he defaulted. This is not a case where the contract left Blue Paper with no remedy.
If mutuality of remedies is understood to mean that both parties to a contract must have the same remedy to enforce it, then the concept has "largely disappeared from the law of American jurisdictions." LaBonte Precision, Inc. v. LPI Indus., Corp., 507 So.2d 1202, 1203 (Fla. 4th DCA 1987); Rohlfing v. Tomorrow Realty & Auction Co., 528 So.2d 463, 466-67 (Fla. 5th DCA 1988). We have held that such an absence of mutuality of remedies will not destroy an agreement's validity. LaBonte Precision, 507 So.2d at 1203; Wright & Seaton, Inc. v. Prescott, 420 So.2d 623, 625, n. 2 (Fla. 4th DCA 1982). "The legal principle requiring mutuality in contracts does not require that in every case each party have the same remedy." Wright & Seaton, 420 So.2d at 625 n. 2 (quoting Bossert v. Palm Beach County Comprehensive Cmty. Mental Health Ctr., Inc., 404 So.2d 1138, 1139 (Fla. 4th DCA 1981)). Here, the contract provided Blue Paper with an enforceable remedy against Provost, so there was no absence of mutuality of remedy that would make specific performance inappropriate.
Next, Blue Paper argues that the parties' agreement to extend the due date for the remaining $25,000 deposit was not supported by any additional consideration; Blue Paper asserts that the original contract obligated Provost to pay the $25,000 and that Blue Paper did not receive "anything that it did not already have" when it agreed to the extension.
A showing of such additional consideration was not required because Blue Paper waived its right to insist on the full $100,000 deposit at the time of the execution of the November, 2002 contract and the January 13, 2003 amendment. Where a party's waiver of a contractual right puts the other party "off his guard" and "leads him to believe that a right has been waived," no consideration is necessary to support the waiver. See Gilman v. Butzloff, 155 Fla. 888, 22 So.2d 263, 265 (1945). The January 13 amendment indicated that Blue Paper had paid the full deposit when both parties knew that $25,000 had not been paid. The parties agreed that the remaining $25,000 would not be due until Blue Paper needed it to satisfy the requirements of its construction loan.
Under Florida law, it was not necessary that the parties' agreement to extend the time for tender of the remaining deposit be in writing. "A written contract may be modified by an oral agreement if the parties have accepted and acted upon the oral agreement in a manner that would work a fraud on either party to refuse to enforce it." W.W. Contracting, Inc. v. Harrison, 779 So.2d 528, 529 (Fla. 2d DCA 2000); see Prof'l Ins. Corp. v. Cahill, 90 So.2d 916, 918 (Fla.1956); Jupiter Square S.C. Assocs., Inc. v. Tomary, Inc., 571 So.2d 538 (Fla. 4th DCA 1990). Under *1053 these circumstances, an oral modification may be permissible even where, as here, a written contract contains a provision prohibiting modification except in writing.
In this case, Provost did not tender the remaining $25,000 because Ieracitano told him he did not have to do so. Provost relied on this assurance. "The law is well settled that the vendor cannot take advantage of a delay in performance which he condoned or was a party to. This is true when time is the essence of the contract." Forbes v. Babel, 70 So.2d 371, 372 (Fla. 1953). Here, the parties made time not of the essence for Provost's tender of the remaining $25,000. Blue Paper terminated the contract before notifying Provost that the $25,000 was due. Blue Paper was not entitled to terminate the contract for failure to pay the additional $25,000 without notifying Provost and giving him a reasonable time to perform. See Felt v. Morse, 80 Fla. 154, 85 So. 656, 657 (1920); Heilman v. Repp, 768 So.2d 1144, 1145 (Fla. 4th DCA 2000).
Affirmed.
MAY, J., and SCOLA, JACQUELINE H., Associate Judge, concur.
NOTES
[1] Whether Provost was given notice to pay the additional $25,000 was vigorously contested at trial. However, we are bound by the findings of the trial court on issues of credibility. We note that at the conclusion of the bench trial, the trial judge expressed "a lot of confidence in Mr. Provost's testimony," which he described as "precise, candid, and truthful."