GROSS, C.J.
 

 Appellant DK Arena, Inc., owned real property known as Mangonia Park Jai Alai Fronton (“arena property”). Appellee EB Acquisitions I, LLC, contracted with DK Arena to purchase the property for development. DK Arena sued EB for breach of contract, seeking to retain a $1,000,000 deposit. EB filed an answer and counterclaim attacking the real estate contract on various grounds and asserting the breach of an oral joint venture agreement that arose from the parties’ dealings while the contract was pending. After a bench trial, the court found in favor of EB, ordering the return of its $1,000,000 deposit and awarding it $500,000 in damages on its counterclaim for breach of the oral joint venture agreement.
 

 We affirm that portion of the judgment ruling that EB was entitled to the return of its deposit, rejecting DK Arena’s arguments that rely on the statute of frauds. We reverse that portion of the judgment awarding $500,000 in damages, because the pax-ties failed to create an enforceable joint venture agreement that would support a damage award.
 

 We state the facts in the light most favorable to EB, the pi-evailing pax-ty below.
 
 See, e.g., Blue Paper, Inc. v. Provost,
 
 914 So.2d 1048, 1049 (Fla. 4th DCA 2005).
 

 The July 2004 Real Estate Contract
 

 John Markey, who later formed EB, met with Mike Masanoff of the South Florida Regional Transit Authority about developing the arena property into a “transit oriented development.” Masanoff an-anged a meeting between himself, Markey, and Don King, the celebrity boxing promoter who owned DK Arena. King was in favor of a development, and indicated that he
 
 *317
 
 would be able to “deliver” the community and County Commissioner Addie Greene. Markey wrote a letter to King on July 14, 2004, expressing his intent to purchase the arena property.
 

 Markey formed EB to acquire the property. Through EB, Markey wanted to turn the arena property into a mixed use development, with both residential and commercial elements, that would integrate the Tri-Rail station already there. The estimated budget for constructing the development was $250,000,000.
 

 On July 20, 2004, EB and DK Arena entered into a written contract where EB agreed to purchase the arena property for $23,000,000, with an escrow deposit of $1,000,000. The agreement provided for a due diligence period of 60 days, which would begin to run on July 20, the effective date of the agreement, and terminate on September 20, 2004. The closing would take place 30 days after the expiration of the due diligence period. The failure of EB to “deliver written notice to [DK Arena] prior to the expiration of the Due Diligence period of [EB]’s determination of whether or not the Property [was] acceptable” would constitute EB’s “as is” acceptance of the contract.
 

 Paragraph 9 of the contract further provided that the deposit would be returned “in the event any condition of this Contract [was] not met and Buyer ... timely [gave] any required notice regarding the condition having not been met.” Either party could claim the deposit pursuant to paragraph 10:
 

 10. DEFAULT:
 

 (a) In the event the sale is not elosed due to any default or failure on the part of Seller other than failure to make the title marketable after diligent effort, Buyer may either (1) receive a refund of Buyer’s deposit(s) or (2) seek performance....
 

 (b) In the event the sale is not closed due to any default or failure on the part of Buyer, Seller may either (1) retain all deposit(s) paid or agreed to be paid by Buyer as agreed upon liquidated damages, consideration for the execution of this Contract, and in full settlement of any claims, upon which this Contract will terminate or (2) seek specific performance....
 

 Finally, paragraph 15 of the contract provided that modifications of the contract would “not be binding unless in writing, signed and delivered by the party to be bound.”
 

 At the same time, DK Arena and EB also entered into an addendum that was incorporated into the above contract. Paragraph 4 of the addendum allowed EB to terminate the agreement at any time during the due diligence period. The addendum also provided additional terms concerning the deposit:
 

 10. DEPOSIT. At the end of the Due Diligence Period, assuming that [EB] has not given notice to [DK Arena] that it intends to terminate the Contract, the parties shall take the following actions:
 

 (a) The Deposit shall be released to [DK Arena],...
 

 A point of contention at trial was paragraph 14 of the addendum:
 

 14. LAND USE APPLICATION. [EB] may in its discretion, at its sole cost and expense, apply for land use and any other governmental and quasi-governmental approvals relating to its proposed development of the Property. [DK Arena] and its principal, Mr. Don King, shall cooperate in the foregoing applications and processes. [DK Arena] and its principal, Mr. Don King, shall also reasonably cooperate in the marketing and promotion of the redevelopment of the Property. In consid
 
 *318
 
 eration of [DK Arena] and Mr. King’s efforts, [EB] shall convey title to [DK Arena] of 2(two) of the highest price residential units offered to the general public upon completion of construction of the first phase of development.... This clause shall survive the Closing. [DK Arena]’s and Mr. King’s agreement to cooperate with [EB] in connection with the obtaining of governmental approvals, marketing and promotion is a material inducement of [EB] entering into this Contract.
 

 King understood paragraph 14 to mean that he was required to lobby for government approval of the project and speak at public meetings on its behalf. Charles Lomax, DK Arena’s general counsel, understood that King was obligated to attend the meetings of the Mangonia Town Council. Believing that paragraph 14 was “extremely significant,” Markey saw it as insuring that King would bring “his celebrity clout, his oratory[,] his ability, and his connections to the community” to support the project.
 

 Finally, addendum paragraph 15 provided that “[t]his transaction [did] not create a joint venture or partnership relationship among the Parties.”
 

 The Due Diligence Period Through October 4
 

 On September 13, 2004, DK Arena and EB amended the July 20 contract to extend the due diligence period by 14 days, until October 4, 2004. Consistent with paragraph 15 of the contract, this amendment was in writing and signed by both DK Arena and EB.
 

 At a meeting at Kng’s office, Markey and King orally agreed to convert their agreement into a joint venture, whereby DK Arena would leave some equity in the project and receive a portion of ownership. After several meetings, Markey and King hammered out important terms of the joint venture and shook hands on a “rock solid” agreement where DK Arena was to receive equity in the project and provide a mortgage to EB. Markey testified that the goal of the proposed project was 1500 residential units and about 350,000 square feet of commercial space. King told Markey to “write up” a formal proposal and give it to his lawyers.
 

 On September 27, 2004, Markey sent King, through attorney Lomax, the formal proposal “outlining the terms of [their] joint venture,” “per [their] previous negotiations”:
 

 1. A new single purpose entity (“the L.L.C.”) will be formed to develop the property with Don Kng as 25% member.
 

 2. The L.L.C. will purchase the property from DK Arena for $23,000,000.
 

 3. Closing will take place approximately 6 weeks after formation of the new L.L.C. Don Kng will receive $15,000,000 cash and a second mortgage, subordinate to the primary lender, in the amount of $8,000,000 at the closing.
 

 4. Payment of the $8,000,000 second mortgage will be contingent upon the granting of all approvals to build the project.
 

 5. EB Developers will fund all costs for approvals and Don Kng will have no obligation to provide additional funding.
 

 6. Don King will assist with obtaining approvals, public relations and marketing.
 

 [[Image here]]
 

 • Additional equity from JKM & EB on proportionate basis.
 

 • DK will be permitted to invest equity in shop [illegible]
 

 
 *319
 
 If King approved the above terms, Markey testified that he would have reduced the joint venture agreement to writing.
 

 After the September 27, 2004 letter, the parties negotiated “back and forth” and their attorneys exchanged various versions of the agreement. On September 29, EB sent DK Arena a proposed amendment to the agreement, which would have converted the purchase contract into a joint venture agreement where EB would pay DK Arena $15,000,000 in cash and DK Arena would take back an $8,000,000 mortgage and receive a 25% equity interest in EB. The September 29 amendment proposed to extend the due diligence period and eliminate paragraph 15 from the addendum to the purchase contract, which paragraph disclaimed the formation of a partnership or joint venture between DK Arena and EB.
 

 Several attorneys working for DK Arena analyzed the September 29 amendment and pointed out areas of concern. From King’s perspective, his attorneys “never really presented” the proposal to him “with the stamp of approval,” so that no deal was ever made. However, Markey believed that he and King had already “agreed to the deal before. It was just a matter of how do you memorialize it in writing, and get the legalese correct! ].”
 

 On October 4, 2004, the day the due diligence period was to expire, King and Markey met at King’s office. Each man had two lawyers with him. King and Mar-key agreed to hold the due diligence period “in abeyance” until they “could get the joint venture agreement memorialized.” There was no set time frame for the extension of the due diligence period, but it was tied into a late October hearing with the city of Mangonia Park, which had to approve the project before it could proceed.
 

 The Project Falls Apart
 

 King and Markey attended an October 4, 2004 Mangonia Town Council meeting with their attorneys. Markey pitched the project to the council. He showed them site plans and renderings of the project and explained his vision for the development. King’s presentation to the council extolled the potential benefits of the project. In response to a question from a councilperson about his involvement with the project, King said that his involvement went beyond just selling the land to EB. He said he would be a “partner owner,” a “part owner as well as a seller,” a “large minority owner in the thing.”
 
 [1]
 

 Generally, the feeling at the meeting was that the council and community had not been given enough notice, and there were some concerns about the project. As a result, the council scheduled an informational meeting for October 24, 2004, “where the community had enough time to have notice to attend the meeting.” King told Markey and the council he would attend this second meeting.
 

 On October 11, 2004, representatives from EB and DK Arena held discussions about the project, which included talk of the expiration of the contract’s due diligence period. One of King’s attorneys said that even if EB terminated the agreement, DK Arena would still negotiate with them on the terms of a joint venture. In the end, EB neither gave DK Arena notice of its intent to terminate the contract, nor did it release the deposit to DK. DK
 
 *320
 
 Arena neither demanded the deposit nor notified EB that the due diligence period had expired.
 

 After October 11, the parties acted as if they were still going forward together on the project. Markey wrote King about his October 12 meeting with city officials and King’s attorneys were still working on changes to the joint venture agreement. On October 18, a King attorney sent a modified version of the joint venture agreement to one of EB’s attorneys.
 

 However, no written joint venture agreement was ever executed by the parties.
 

 In the meantime, while negotiations with EB were ongoing, King spoke several times with his friend, County Commissioner Greene. Greene told King that MGM had approached her about an entertainment facility/theme park project for the property. She tried to persuade King to abandon the project with EB and gave him MGM’s proposal to review.
 

 The October 26 Mangonia Town Council meeting occurred as scheduled. King did not attend, even though he was in Palm Beach County. Markey spoke on behalf of the project, but the council’s skepticism “rapidly turned to hostility.” Commissioner Greene addressed the meeting and disclosed MGM’s proposal for the arena property, which would “bring over 2,000 jobs” to the county. She said she had told King that the county preferred the MGM project, not Markey’s. Both Markey and his lawyers believed that King’s absence from the meeting was “very damaging to the prospeet[s]” of the project.
 

 On October 27, Markey was “flabbergasted” by DK Arena’s demand to the escrow agent for the release of the $1,000,000 deposit because he believed that they were “moving forward” with the joint venture. He instructed his escrow agent not to release the deposit. Markey’s attorney fired off a letter that DK Arena had breached paragraph 14 of the addendum because King had failed “to cooperate in the governmental and quasi-governmental processes.” EB demanded a return of the deposit.
 

 Also on October 27, King received an offer to purchase the arena property for $24,000,000 to develop it into an entertainment complex.
 

 Markey testified he “easily” spent “half a million dollars” on the project, with almost all of the expenses coming after EB and DK Arena entered into the contract. He spent “easily $200,000” on architects’ fees, roughly $120,000 in legal fees, $50,000 to $60,000 in engineering studies, and staff costs of “conservatively another $150,000.” At trial, he offered no documentation for these expenses, explaining that EB was a defunct corporation without a “server.”
 

 The Final Judgment
 

 In its final judgment, the trial court found that King’s failure to attend the October 26 town council meeting breached paragraph 14 of the addendum, which required King to “do all that was reasonable to support the project.” The court found that King’s failure to attend led to “the eventual demise of the project and the parties’ relationship.” The court determined that King’s failure to attend the meeting, his demand of the deposit, and the receipt of a new offer for the property were not “coincidental.” The court concluded that the oral, indefinite extension of the due diligence period was enforceable and that an oral joint venture agreement existed for the “limited” purpose of creating “modified partnership documents containing the final details of the partnership.” The court awarded EB the return of its deposit and $500,000 in damages for breach of the oral joint venture agreement.
 

 
 *321
 
 EB is Entitled to the Return of the $1,000,000 Deposit
 

 On a number of grounds, DK Arena attacks the circuit court’s decision to return the deposit to EB. We address four: (1) whether there was adequate evidentia-ry support for the oral extension of the due diligence period, (2) whether the oral extension was precluded by the provision in the contract that required modifications to be in writing, (3) whether the oral extension was barred by the statute of frauds, and (4) whether the oral extension was unenforceable because it was indefinite.
 

 First, DK Arena argues that competent, substantial evidence does not support the trial judge’s finding of an oral extension to the due diligence period. “[A] lower court’s ultimate factual determinations during a non-jury trial may not be disturbed on appeal unless shown to be unsupported by competent and substantial evidence....”
 
 Zupnik Haverland, L.L.C. v. Current Builders of Fla., Inc.,
 
 7 So.3d 1132, 1134 (Fla. 4th DCA 2009) (citation omitted). The testimony of Markey and one of his attorneys, as well as King’s statements at the October 4 Town Council meeting, support the judge’s conclusions. There was nothing “inherently incredible” or “improbable” about this testimony that would prevent the judge from relying upon it.
 
 See Shaw v. Shaw,
 
 334 So.2d 13, 16 (Fla.1976). Thus, sufficient evidence supports the judge’s finding that the parties agreed to an oral extension of the due diligence period.
 

 We also reject DK Arena’s apparent argument that the parol evidence rule prohibits evidence of a subsequent oral agreement to extend the due diligence period. “The parol evidence rule applies to [oral] agreements between the parties to a written contract which are made before or at the time of execution of the contract. It does not apply to the admission of subsequent oral agreements that alter, modify, or change the former existing agreement between the parties.”
 
 Pavolini v. Williams,
 
 915 So.2d 251, 254 (Fla. 5th DCA 2005) (citing
 
 Wilson v. McClenny,
 
 32 Fla. 363, 13 So. 873 (1893);
 
 Vorzimer v. Kaplan,
 
 362 So.2d 451 (Fla. 3d DCA 1978)). Here, the oral modification occurred approximately 2.5 months after the July 2004 agreement, so the parol evidence rule would not serve to exclude evidence of the modification.
 

 Next, DK Arena contends that the oral extension is not enforceable because it violates paragraph 15 of the contract, which provided that modifications of the contract would “not be binding unless in writing, signed and delivered by the party to be bound.” However, our decision in
 
 Blue Paper, Inc. v. Provost,
 
 914 So.2d 1048 (Fla. 4th DCA 2005), upon which the circuit court relied, supports the court’s decision. There, we held that even where a written contract prohibits subsequent, unwritten amendments, “ ‘[a] written contract may be modified by an oral agreement if the parties have [1] accepted and [2] acted upon the oral agreement in a manner that would work a fraud on either party to refuse to enforce it.’ ”
 
 Id.
 
 at 1052 (quoting
 
 W.W. Contracting, Inc. v. Harrison,
 
 779 So.2d 528, 529 (Fla. 2d DCA 2000)).
 

 Involving an oral modification to a contract that prohibited unwritten amendments, the salient facts in
 
 Blue Paper
 
 are similar to those in this case.
 
 Id.
 
 at 1050.
 
 Blue Paper
 
 involved the purchase and sale of a townhouse. The purchaser was supposed to make a $100,000 deposit on the property, but tendered only $75,000.
 
 Id.
 
 at 1049. The purchaser “did not tender the remaining $25,000 because [the developer] [orally] told him he did not have to
 
 *322
 
 do so” until some later date.
 
 Id.
 
 at 1053. Nonetheless, contending that the purchaser was “in default for failure to post the additional $25,000 deposit,” the developer terminated the contract.
 
 Id.
 
 at 1050.
 

 This court held that the oral modification allowing a $75,000 deposit was enforceable, even though the “written contract contain[ed] a provision prohibiting modification except in writing.”
 
 Id.
 
 at 1052-53. We concluded that, because the purchaser “relied on [the developer’s] assurance” that the remaining $25,000 was not due, the developer could not “ ‘. take advantage of a delay in performance which he condoned or was a party
 
 toId.
 
 at 1053 (quoting
 
 Forbes v. Babel,
 
 70 So.2d 371, 372 (Fla.1953)). Because the parties acted upon the unwritten amendment, we held that it would work a fraud upon the purchaser to refuse to enforce it.
 
 Id.
 
 at 1052-53.
 
 Blue Paper
 
 followed law long established in Florida.
 
 See, e.g., Prof'l Ins. Corp. v. Cahill,
 
 90 So.2d 916, 917-18 (Fla.1956);
 
 Jupiter Square S.C. Associates, Inc. v. Tomary, Inc.,
 
 571 So.2d 538 (Fla. 4th DCA 1990).
 

 Here, like the purchaser in
 
 Blue Paper,
 
 EB relied on the extension of the due diligence period in its effort to bring the joint venture into being. Termination of the purchase contract and a request for a return of the deposit during the due diligence period would have been contrary to the proposed, evolving joint venture that, for a time, both EB and DK Arena were pursuing. Based on the evidence, the court properly enforced the oral extension of the due diligence period.
 
 [2]
 

 DK Arena next argues that the oral agreement to extend the due diligence period violated the statute of frauds. However, the doctrine of estoppel prevents DK Arena from relying on the statute to invalidate its agreement to extend the due diligence period. EB could therefore terminate the contract during the extended due diligence period and obtain the return of its deposit.
 

 Under the applicable portion of Florida’s Statute of Frauds,
 

 [n]o action shall be brought whereby ... to charge any person ... upon any contract for the sale of lands, tenements or hereditaments, or of any uncertain interest in or concerning them ... unless the agreement or promise upon which such action shall be brought, or some note or memorandum thereof shall be in writing and signed by the party to be charged therewith or by some other person by her or him thereunto lawfully authorized.
 

 § 725.01, Fla. Stat. (2004). “ ‘The statute of frauds grew out of a purpose to intercept the frequency and success of actions based on nothing more than loose verbal statements or mere innuendos.’ ”
 
 Tanenbaum v. Biscayne Osteopathic Hosp., Inc.,
 
 190 So.2d 777, 779 (Fla.1966) (quoting
 
 Yates v. Ball,
 
 132 Fla. 132, 181 So. 341, 344 (1938));
 
 see also Rowland v. Ewell,
 
 174 So.2d 78, 80 (Fla. 2d DCA 1965) (citing Yates). The statute’s “primary object” is “to prevent the setting up
 
 of
 
 pretended agreements and then supporting them by perjury” in swearing contests where one person’s word is pitted against that of another.
 
 Reynolds v. Dixon,
 
 187 Va. 101,
 
 *323
 
 46 S.E.2d 6, 8 (1948). While the statute of frauds “should be strictly construed to prevent the fraud it was designed to correct,”
 
 Yates,
 
 181 So. at 344, it should not be used as an instrumentality “in aid of fraud or as a stumbling block in the path of justice.”
 
 Cramer v. Ballard,
 
 315 Mich. 496, 24 N.W.2d 80, 86 (1946) (Boyles, J., concurring).
 

 The circuit court found that the parties orally agreed to extend the due diligence period, that EB relied on the extension to negotiate the proposed joint venture agreement, and that EB was authorized to demand the return of the deposit during the extended period. At no time prior to its October 27 demand for the release of the deposit did DK Arena notify EB that it was withdrawing its consent to the extension of the due diligence period.
 

 The key to this case is that EB changed its position in reliance upon the oral agreement to extend the due diligence period — it did not give notice under paragraph 10 of the addendum that it intended to terminate the contract. This is the basis of an estoppel that prevents DK Arena from avoiding the extension to which it agreed. “The oral agreement does not itself create such an estoppel; there must always be a change of position in reliance upon it. Even then, the party estopped is merely held to his written promise, but on different conditions.”
 
 Young v. Pottinger,
 
 340 So.2d 518, 521 (Fla. 2d DCA 1976) (quoting 2 Arthur L. Corbin,
 
 Corbin on Contracts
 
 § 310 (1950)). “Enforcement of the doctrine of estoppel in such a situation” does not violate the statute of frauds.
 
 Id.
 
 (quoting
 
 Warren v. Dodge,
 
 83 N.H. 47, 138 A. 297, 299 (1927)). Instead, “the oral modification operates as a defense to a claim of the breach or nonperformance of the written contract rather than as giving any right of action for the breach of the modification.”
 
 Warren,
 
 138 A. at 299. As the New Hampshire Supreme Court has observed, where the parties to a real estate contract orally agree to extend a deadline specified in the contract, and a party to the contract has acted in reliance on the agreement,
 

 [i]t is not the enforcement of the oral agreement that is sought, but a legal excuse for noncompliance with the terms of the written contract that is claimed.... The written contract remains unchanged, but the [party being estopped], by reason of the situation brought about by reliance upon their own words and conduct, may not be heard to say that the [other party] has not lived up to it.
 

 Id.
 
 “The rule is well understood that, if there is forbearance at the request of a party, the latter is precluded from insisting upon nonperformance at the time originally fixed by the contract as a ground of action.”
 
 Thomson v. Poor,
 
 147 N.Y. 402, 42 N.E. 13, 15 (1895).
 

 Florida courts have applied the doctrine of estoppel to defeat claims that a party’s reliance on an oral extension of the time to perform a written real estate contract violated the statute of frauds. In
 
 Young v. Pottinger,
 
 buyers exercised an option to purchase real property, but orally agreed to delay closing to allow the sellers, an elderly couple, to “continue residing on the property.” 340 So.2d at 519. During the extension, another couple, the Pottingers, swooped in and convinced the elderly couple to convey the property to them.
 
 Id.
 
 The buyers sued the Pottingers for tor-tious interference with their contract with the elderly sellers.
 
 Id.
 
 The trial court granted the Pottingers’ motion to dismiss for failure to state a cause of action.
 
 Id.
 

 On appeal, the Pottingers urged affir-mance of the dismissal because the buyers were “relying upon an oral extension of an agreement to convey real property in vio
 
 *324
 
 lation of the statute of frauds.”
 
 Id.
 
 Quoting extensively from
 
 Warren v. Dodge,
 
 the second district reversed the dismissal, holding that the buyers had “pled themselves around” the statute of frauds defense by demonstrating an estoppel on the face of their pleading, so that the complaint stated a cause of action for tortious interference with their contract to purchase.
 
 Id.
 
 at 520-21.
 

 Relying on
 
 Young v. Pottinger,
 
 the first district later held that a party to a real estate contract could rely on “estoppel or waiver” to avoid the statute of frauds defense to its breach of contract claim by pleading that “it detrimentally relied on an oral modification, such as an extension of the time of performance agreed to by” the other party to the contract.
 
 Affordable Homes, Inc. v. Devil’s Run, Ltd.,
 
 408 So.2d 679, 680 (Fla. 1st DCA 1982).
 

 The third district followed
 
 Young
 
 and
 
 Affordable Homes
 
 in
 
 United of Omaha Life Insurance Co. v. Nob Hill Associates,
 
 450 So.2d 536, 539 (Fla. 3d DCA 1984). The court recognized that where one party to a real estate contract took action in reliance upon an oral agreement to extend the time for performance, the other party is estopped from relying on the statute of frauds to claim “that it did not agree to a longer period of time for compliance.”
 
 Id.
 
 at 539.
 

 Young, Affordable Homes,
 
 and
 
 United of Omaha
 
 each involve oral extensions of time to perform real estate contracts; all support the application of estoppel to this case. The principle is “fundamental and unquestioned,” with “roots in the yet larger principle that no one shall be permitted to found any claim upon his own inequity or take advantage of his own wrong. The statute of frauds was not intended to offer an asylum of escape from that fundamental principle of justice.”
 
 Imperator Realty Co. v. Tull,
 
 228 N.Y. 447, 127 N.E. 263, 266 (1920) (Cardozo, J., concurring) (citations omitted).
 
 [3]
 

 DK Arena relies primarily on our decision in
 
 Wharfside at Boca Pointe, Inc. v. Superior Bank,
 
 741 So.2d 542, 545 (Fla. 4th DCA 1999), which states the general rule that an “agreement that is required by the statute of frauds to be in writing cannot be orally modified.”
 
 Wharfside
 
 involved a written contract for the purchase of an interest in a commercial real estate project for $3.1 million.
 
 Id.
 
 at 543. The buyer failed to close.
 
 Id.
 
 The buyer contended that it reached an oral agreement that “provided for a reduced purchase price of $1.6 million” and an extension of the closing date.
 
 Id.
 
 at 544. The buyer later sought specific performance of the oral agreement.
 
 Id.
 
 We held that the “attempted oral modification” of the written contract was “insufficient to satisfy the requirements of ... [the] statute of frauds.”
 
 Id.
 
 at 545.
 

 Wharfside
 
 does not control this case, and is distinguishable from
 
 Young, Affordable Homes,
 
 and
 
 United of Omaha,
 
 because the oral agreement there sought to modify the sales price, an essential term of the contract. An oral modification of an important term such as the sales price of real property is precisely the type of shenanigan that the statute of frauds was designed to eliminate.
 
 [4]
 
 The estoppel cases
 
 *325
 
 do not condone oral changes to such an important term of a written contract, but prevent a party from ignoring oral modifications to conditions of performance, where to do so, in light of one party’s reliance on the modifications, creates an injustice.
 

 We also distinguish a second case relied upon by DK
 
 Arena
 
 —Shore
 
 Holdings, Inc. v. Seagate Beach Quarters, Inc.,
 
 842 So.2d 1010 (Fla. 4th DCA 2003). Like
 
 Wharf-side, Shore Holdings
 
 involved a would-be buyer of real estate who tried to base a lawsuit upon oral representations that the seller “was prepared to ... accept substantial changes in the financial terms of the transaction” from an earlier written contract.
 
 Id.
 
 at 1012. We held that, because it had already expired, there was no written contract in existence that could have been modified by the parties.
 
 Id.
 
 In dicta, citing to
 
 Whatfside,
 
 we commented that, had there been a written contract, then the statute of frauds would have prohibited the oral modification of its financial terms “under the doctrine of promissory estoppel,” the theory under which the buyer recovered at trial.
 
 Id.
 
 This case involves neither an attempt to modify the financial terms of a written real estate contract, nor an attempt to set up a new enforceable promise under the doctrine of promissory estoppel.
 

 Finally, DK Arena complains that the oral extension to the due diligence period was unenforceable as an agreement for an indefinite duration. This argument misunderstands the legal effect of the oral extension. Because of the operation of the statute of frauds, the oral extension of the due diligence period did not become a part of the written contract that bound the parties. Under the estoppel cases, it is the fact of the oral extension, plus the one party’s acting in reliance upon it, that prevents the other party from invoking the statute of frauds to insist upon strict performance according to the terms of the written contract. Where
 

 one party to a contract, before the time for performance by the other party has arrived, consents, upon his request, to extend the time of performance, he must be presumed to know that the other party relies upon the consent; and until
 
 he gives notice of withdrawal
 
 he has no just right to consider the latter in default, although meanwhile the contract time has elapsed.
 

 Thomson,
 
 42 N.E. at 15 (italics supplied) (court pointed out that “in the absence of a valid and binding agreement to extend the time” for performance of a contract, a party that orally agreed to the extension may “revoke his consent so far as it has not been acted upon”).
 

 Had DK Arena withdrawn its consent to the extension of the due diligence period, EB would have had a reasonable time thereafter in which to terminate the contract.
 
 Id.; see also Warren,
 
 138 A. at 299 (quoting
 
 Scheerschmidt v. Smith,
 
 74 Minn. 224, 77 N.W. 34, 35 (1898)) (an “oral extension of the time of payment became no part of the contract,” so that “defendant might have repudiated it,” but “he could not declare the contract forfeited for nonpayment until the plaintiff had a reasonable time ... to make payment, because the failure to pay on due day was caused by the defendant’s own conduct.”). If DK Arena’s October 27 demand for the deposit is viewed as its revocation of its consent to the extended due diligence period, then EB’s termination of the contract came within a reasonable time, so that it was entitled to a return of its deposit.
 

 The Joint Venture Agreement was Insufficient to Support a Damage Award
 

 We reverse the circuit court’s determination that there was a joint venture
 
 *326
 
 agreement sufficient to support a damage award. The evidence established, at most, an agreement to agree, which is legally insufficient to support a joint venture.
 

 A joint venture is “an association of persons or legal entities to carry out a single business enterprise for profit. It is a partnership of limited scope ... and duration.”
 
 Kislak v. Kreedian,
 
 95 So.2d 510, 514 (Fla.1957). “[T]he relationship of joint adventurers is created when two or more persons combine their property or time or a combination thereof in conducting some particular line of trade or for some particular business deal.”
 
 Id.
 
 at 515. A contract to enter into a joint venture is an “indispensable prerequisite” to the formation of the venture.
 
 Id.
 
 Here, the evidence fails to support the conclusion that there was a meeting of the minds on all of the essential terms of the joint venture.
 

 The discussions about a joint venture arose after the parties had entered into a detailed written contract for the sale of land. The parties clearly contemplated that their final joint venture agreement would be reduced to writing. During October, the attorneys for both sides worked on different aspects of the agreement and weighed the implications of proposed contract terms. Where it appears
 

 that the parties, or either of them, intended that the contract should be reduced to writing, so that its terms would be fully understood and definitely stated in the writing, the contract will not be regarded as complete or binding until it is reduced to writing and acquiesced in by both parties.
 

 Ocala Cooperage Co. v. Fla. Cooperage Co.,
 
 59 Fla. 390, 52 So. 13, 16 (1910).
 

 Especially where the parties intend to reduce their future joint venture agreement to writing, a purported, fully formed, oral joint venture that arose during negotiations should be viewed with suspicion. As the Supreme Court has written,
 

 [when] the events and transactions which form the basis of the alleged relationship are not in writing, the burden of establishing the existence of such contract ... is indeed, as it should be, a heavy and difficult one.... The very fact that the agreement was not reduced to writing is evidence, however slight, that no such agreement actually existed. This is especially true in those cases where ... the alleged relationship is either in its executory stages or has not actually commenced to function to the extent that the actions of the parties themselves may tend to establish the validity of the assertion that such agreement existed.
 

 Kislak,
 
 95 So.2d at 515. Significantly, paragraph 15 of the written addendum specifically excluded the potential for “a joint venture or partnership relationship among the parties,” making EB’s burden, under the facts of this case, even heavier and more difficult.
 

 “A contract is the sum of its component terms. Any variation of the parts is a variation of the whole.”
 
 Imperator Realty Co.,
 
 127 N.E. at 265-66 (Cardozo, J., concurring). Parties’ negotiations vary an evolving contract’s terms. Here, the parties continued to negotiate the terms of the joint venture throughout October and never completed the written contract that they contemplated. Those two facts show that DK Arena and EB did not agree to all the terms of this complex, multi-million dollar development project. Thus, there was an insufficient meeting of the minds to form an enforceable joint venture agreement. At best, DK Arena and EB had an “agreement to agree” on a joint venture in the future, which does not give rise to a contract that entitles a party to recover damages for breach.
 
 See Bergman v. DeI
 
 
 *327
 

 ulio,
 
 826 So.2d 500 (Fla. 4th DCA 2002).
 
 [5]
 
 To find that an enforceable contract arose in a case like this one would turn business negotiations into seas of peril, from which contractual liability could later rise to bite a good faith negotiator.
 

 An oral joint venture agreement for the entire project is unenforceable for a separate reason — it violates the statute of frauds because it was an “agreement that is not to be performed within the space of 1 year from the making thereof.” § 725.01, Fla. Stat. (2004). The general rule is that
 

 when no time is agreed on for the complete performance of the contract, if from the object to be accomplished by it and the surrounding circumstances, it clearly appears that the parties intended that it should extend for a longer period than a year, it is within the statute of frauds, though it cannot be said that there is any impossibility preventing its performance within a year.
 

 Yates v. Ball,
 
 132 Fla. 132, 181 So. 341, 344 (1938) (citation omitted). Following
 
 Yates,
 
 the first district held that an oral agreement was unenforceable under the statute of frauds, where the agreement contemplated the parties’ involvement in a real estate development project through its completion, and where the project would take well over a year to complete.
 
 Ballard-Cannon Dev. Corp. v. Sandman Properties & Dev., LLC,
 
 933 So.2d 1251, 1252 (Fla. 1st DCA 2006). The proposed joint venture was for a complex $250,000,000 real estate project with 1500 residential units and about 350,000 square feet of commercial space. With an equity interest in the project, Don King was to assist in obtaining zoning approvals, in public relations and in marketing of the entire project. As in
 
 Ballardr-Cannon,
 
 the surrounding circumstances show that the parties contemplated a joint venture where “neither party’s performance was intended to be complete within one year.”
 
 Fla. Pottery Stores of Panama City, Inc. v. Am. Nat’l Bank,
 
 578 So.2d 801, 804 (Fla. 1st DCA 1991). Even though a failure to obtain zoning approvals might have caused the project to fizzle out within a year, the statute of frauds nonetheless bars enforcement of the oral agreement because the parties intended that their cooperation in the development of the project would last longer than a year.
 
 See Hosp. Corp. of Am. v. Associates in Adolescent Psychiatry, S.C.,
 
 605 So.2d 556, 557 (Fla. 4th DCA 1992) (where court “adopt[ed] the reasoning” of
 
 All Brand Importers, Inc. v. Tampa Crown Distributors, Inc.
 
 864 F.2d 748 (11th Cir.1989), that parties’ intent controls).
 

 We affirm the final judgment in part and reverse in part and remand to the circuit court for entry of an amended final judgment entering judgment in favor of DK Arena on the claim involving the breach of a joint venture.
 

 MAY and CIKLIN, JJ., concur.
 

 [1]
 

 . At trial, King minimized his statements to the town council as being salesmanship:
 

 [I said] let's go try to sell your project.... And I put my heartfelt passion into it to sell it, you know what I mean, saying that the project would be that even to the extent that I would be a partner in the project, you know, based upon it being appropriate and right, after they analyzed it.
 

 [2]
 

 . DK Arena argues that EB did not
 
 rely
 
 on the oral extension, that it did not terminate the purchase contract because to do so would have been in violation of a side contract with the South Florida Regional Transit Authority. The trial judge was justified in concluding that, with $1 million on deposit and a joint venture in the works, the side agreement with the Transit Authority was not significant to EB’s decision on whether to terminate the contract.
 

 [3]
 

 . While
 
 Blue Paper, Inc. v. Provost,
 
 914 So.2d 1048 (Fla. 4th DCA 2005), is a case decided on contract principles and is not a statute of frauds case, the same considerations that justify allowing an oral modification to a contract that prohibited unwritten amendments also form the basis for applying estoppel to avoid the operation of the statute of frauds.
 

 [4]
 

 . Indeed, enforcement of the alleged oral modification in
 
 Wharfside
 
 would have amounted to a $1.5 million windfall to the buyer.
 

 [5]
 

 . Given the “uniqueness of this transaction,” a court is “not authorized to draft a contract for the parties when the parties themselves have failed to reach agreement on essential details.”
 
 Craig R. Weiner Associates, Inc. v. Sherden,
 
 444 So.2d 431, 433-34 (Fla. 4th DCA 1983).